James Phillip VADAS, Appellant (Respondent Below),

and

John Vadas, Appellant (Intervenor Below),

v.

Rita J. VADAS, Appellee (Petitioner Below).

No. 45S04–0103–CV–145.

Supreme Court of Indiana.

Feb. 22, 2002.

P. Jeffrey Schlesinger, Crown Point, IN, for Appellants.

Lynn Hammond, Merrillville, IN, for Appellee.

SHEPARD, Chief Justice.

James and Rita Vadas occupied and maintained a house James had sold to his father before their marriage. They spent time and money remodeling it in anticipation of buying it back some day. When they divorced, the trial court treated the home as a marital asset. It was not.

**Facts and Procedural History**

In October 1993, James Vadas needed cash to pay his financial obligation to an earlier wife. His father John Vadas agreed to buy James' house on Cline Ave-

nue in Crown Point for $128,000, part of which he financed with an $89,600 mortgage.

James and Rita married in April 1995. Within a few months, Rita sold a house she received from a previous divorce settlement and the couple moved into the Cline Avenue home. About $20,000 of proceeds from the sale went into remodeling the Cline Avenue property. James took a four-month leave of absence from his job to work on the remodeling, and throughout their marriage, James and Rita paid the mortgage on the property.

John, James and Rita all expected that James and Rita would buy the house back from John when they were financially able, but this never came to pass. In May 1997, Rita filed for dissolution of the marriage and claimed an equitable interest in the house. The trial court treated the entire net equity of $78,000 [1] as a marital asset. It awarded the real estate interest to John and ordered him to pay half the amount to Rita.

On review, the Court of Appeals agreed that "Rita and James held a vested, present interest in said property through their joint efforts and monetary contributions" and affirmed. *Vadas v. Vadas*, 728 N.E.2d 250, 259 (Ind.Ct.App.2000). We granted transfer.

## I. An Expectation Is Not a Vested Interest

■ A baseline principle of Indiana family law is that "[o]nly property with a vested interest at the time of dissolution may be divided as a marital asset." *Mullins v. Matlock*, 638 N.E.2d 854, 856 (Ind. Ct.App.1994). *Black's Law Dictionary* 1557 (7th ed.1999) defines a vested interest as one "[t]hat has become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute." *See also id.* at 856.

This basic axiom has been applied to a variety of types of claims. *See, e.g., Kirkman v. Kirkman*, 555 N.E.2d 1293 (Ind. 1990) (pension benefit right properly excluded from property division because it had neither vested nor become nonforfeitable upon termination of employment); *Harris v. Harris*, 690 N.E.2d 742 (Ind.Ct. App.1998) (employer 401(k) plan contributions that are contingent upon retirement at the company are not vested interests, and thus not divisible as marital assets); *Hacker v. Hacker*, 659 N.E.2d 1104 (Ind. Ct.App.1995) (value of potential inheritance not includible in marital "pot"); *Mullins v. Matlock*, 638 N.E.2d at 856 ("A chose in action, not vested but rather contingent and speculative in nature and in value, is not capable of division and thus not marital property subject to equal distribution. . . .").

The facts presented here find a close analogy to those of *In re Dall*, 681 N.E.2d 718 (Ind.Ct.App.1997). There, the wife's parents provided $93,000 to build a home that was to be conveyed to the husband and wife at some indefinite future date. *Id.* at 719–20. The husband labored 2,400 hours helping to construct the home and, when the couple divorced, the trial court included the home in the marital estate at a value of $150,000. *Id.*

The Court of Appeals reversed, holding that "an equitable interest in real property titled in a third-party, although claimed by one or both of the divorcing parties, should not be included in the marital estate." *Id.* at 722. Although the couple "may have hoped eventually to acquire legal title to

---

1. Based on an appraised value of $165,000, (R. at 100), less John's remaining mortgage balance of $87,000, (R. at 101).

the property ... they did not have a definite agreement that title would be transferred to them." *Id.* at 721 (distinguishing *Sovern v. Sovern,* 535 N.E.2d 563 (Ind.Ct. App.1989), where "the owners of record title disclaimed any interest in the real estate."). Therefore, in *Dall,* "neither Husband nor Wife possessed the definite interest necessary for the home to be included in the marital estate." 681 N.E.2d at 721.

The holding of *Dall* promotes predictability, consistency and efficiency by excluding "remote and speculative" interests from the marital estate. *See* 681 N.E.2d at 722. The property at issue here is just such a speculative interest. Rita's investment and James' labor increased the home's value during the marriage, but general market conditions before and after the marriage would also account for some part of the appreciation. (R. at 146–47, 279, 284.) The sale to James and Rita was to occur at some unspecified future date, contingent upon James' getting back "on his feet" financially. (R. at 144.) Neither price nor terms had been discussed, although John wanted to recover what he put into the property (unlike the record owner in *Sovern,* who did not claim any interest in the property in question). (R. at 147.)

Because James and Rita did not have a vested interest in the Cline Avenue home, the trial court erred in including $78,000 equity as marital property. Of course, the relationship between James and John Vadas and James' occupation of the remodeled residence reflects on the relative housing needs of James and Rita and is a relevant consideration in dividing the property that is a part of the marital pot.

## II. A Moot Jurisdictional Challenge

■ The trial court entered judgment against both James and John in the total amount of $35,261.54, and ordered the

judgment attached to the Cline Avenue home. The court allowed thirty days for payment in full, under penalty of forced sale of the property.

On appeal, James and John argue that the trial court lacked personal jurisdiction over John due to improper service. *Vadas,* 728 N.E.2d at 256, (Appellant's Br. at 5). Because we have concluded that the residence was not marital property, we reverse both the judgment against John Vadas and the attachment of the judgment to the Cline Avenue real estate, and need not address the question about personal jurisdiction.

## III. The Personal Property Division

On appeal, James also challenges the trial court's valuation and division of the parties' personal property, largely attacking the values assigned by the court. We summarily affirm the Court of Appeals' holding that there was no error as to valuation. Ind. Appellate Rule 58(A)(2).

### Conclusion

We reverse the judgment insofar as it included the residence as a marital asset and remand so the trial court can reconsider division of the other assets.

DICKSON, and RUCKER, JJ., concur.

BOEHM, J., dissents with separate opinion, in which SULLIVAN, J., concurs.

## ON PETITION FOR TRANSFER

BOEHM, Justice, dissenting.

I respectfully dissent. I believe the property at issue should be included as marital property and that it was unnecessary to add John Vadas as a party to this case.

### I. James is Estopped from Denying His Interest in the Marital Home

Although I agree with the majority that John has title to the house as against the

rest of the world, I believe James is estopped from denying that the couple's interest in the property had vested. The doctrine of estoppel "springs from equitable principles, and it is designed to aid in the administration of justice where, without its aid, injustice might result." *Levin v. Levin,* 645 N.E.2d 601, 604 (Ind.1994). Actual intent to defraud is not required, and "[t]he result of the conduct triggers the application of the theory." *Lawshe v. Glen Park Lumber Co.,* 176 Ind.App. 344, 347, 375 N.E.2d 275, 278 (1978). The *Lawshe* court noted:

> [I]f one party is induced by another, on the faith of an oral promise, to place himself in a worse position than he would have been in had no promise been made, and if the party making the promise derives a benefit as a result of the promise, a constructive fraud exists which is subject to the trial court's equity jurisdiction.

*Id.* Although it appears to me that the transfer from James to John and the subsequent investment in the home by Rita were both done in good faith, these events nevertheless give rise to estoppel.

James purchased the house during his first marriage, and initially held the property jointly with his first wife. After dissolution of the first marriage, James "sold" the house to John to permit James to satisfy his financial obligations from the first marriage. In substance, John purchased the property from James at one third of its market value because the mortgage in the amount of $89,000 on a $128,000 sale was, in practical terms, retained as an obligation of James. Both John and James agreed that the house would be transferred back to James when James was "ready." After the sale, James continued living in the house for over a year and a half. When James married Rita, the couple lived in the house except for a few months when they resided at Rita's house to prepare it for sale. The couple paid all expenses of the house, including the mortgage, taxes, and insurance. They, not John, claimed the mortgage interest as a deduction on their joint tax return, which is permissible only if it was their debt and not John's.

After James and Rita married, the couple decided to remodel the house and refinance the home in their name as quickly as possible so Rita could avoid recognizing gain from the sale of her house by reinvesting the proceeds. This was permissible only if the house in which Rita invested the proceeds was her own principal residence. 26 U.S.C. § 1034 (1994). James assured Rita that the refinancing would be completed before February 1998. Relying on James' statements that the house would be deeded back to James and Rita, Rita, who knew the house was titled in John's name, used all of the net proceeds from the sale of her home to remodel the house.[1] This contributed to an increase in the value of the house of almost $40,000. The majority notes that "Rita's investment and James' labor increased the home's value during the marriage, but general mar-

---

1. Rita and James opened a joint checking account once they were married, and Rita deposited the net proceeds from the sale of her house, $25,158.55, in the joint checking account. Rita also deposited all of her paychecks in the joint checking account after the couple was married. James, on the other hand, had a separate business account which was not shared with Rita and to which Rita had no access. The trial court found that checks totaling $32,044.77 were written on the parties' joint checking account for supplies, appliances, and materials for the house at issue. Although it is disputed whether and how much money James contributed to the joint accounts during the marriage, James, who took a leave of absence for a period of four months during the marriage, admitted that he had less than $5,000 in the account at the time he married Rita.

ket conditions before and after the marriage would also account for some part of the appreciation." The record seems to me to establish that most, if not all, of the increase was attributed to Rita's investment in the home.[2] It is clear that Rita directly infused a substantial sum for improvements to the home, including a new roof, new siding, new drywall, new kitchen cabinets, new appliances, new floors, new carpeting, and a newly remodeled bathroom. John, on the other hand, invested no funds in the remodeling of the real estate. John also allowed James, and eventually James and Rita as a couple, to take the interest deduction for tax purposes on the mortgage. All of this adds up to a substantial reliance by Rita in the home's being a marital asset.

This court recently applied the doctrine of estoppel in *Levin v. Levin.* In *Levin,* a married couple had a child after the wife was artificially inseminated. *Id.* at 603. The husband supported the child and held him out as his during the marriage. *Id.* The couple ultimately divorced, and the dissolution decree required the husband to pay child support. *Id.* After paying child support for five years, the husband filed a motion requesting the court to vacate the child support order because the child was not his biological son. *Id.* The trial court denied his motion, and the Court of Appeals affirmed. *Id.* After granting transfer, this Court affirmed the trial court's decision, holding that the husband was equitably estopped from denying his child support obligation based on several factors, including: (1) the husband induced the wife to go forward with the artificial

insemination; (2) the wife relied in good faith upon the husband's actions; (3) the husband consented to the procedure; (4) the couple held the child out as his; and (5) to hold otherwise would be unjust. *Id.* at 604–05.

Applying these standards, estoppel is appropriate here. James and John induced Rita to go forward with remodeling the property, and Rita relied upon James and John's actions, believing in good faith the house would belong to her and James. All parties involved agreed that the house would be transferred back to James and Rita, and, as a result, everyone treated the property at issue as if Rita and James owned the property.

## II. The House "Sale" to John was in Substance a Loan from John

One way to view this arrangement is a sale subject to a repurchase agreement for $37,000. If so, the value of the equity in the home above the sum of the repurchase price of $37,000 plus the mortgage of $87,000 is a marital asset, just as any option to buy at below market price has value. I think this arrangement may also be properly viewed as, in effect, a loan secured by an equitable mortgage from John. As such, the debt to John of $37,000 is a marital liability, and the couple's interest in the house is a marital asset. "[A] court may find an equitable mortgage where a deed, absolute on its face, is executed simultaneously with an agreement under which the grantor is entitled to a reconveyance upon performance of conditions." *Moore v. Linville,* 170 Ind.

---

**2.** The only indication in the record that the value increase was due to market conditions was a statement made by James claiming that the increase was because the "[p]roperty values go up regardless." The house was sold to John in 1993 for $128,000 and was appraised at $165,000 in 1997, an increase of $37,000 in

less than four years. The trial court found the remodeling cost was $32,044.77. As a result, it seems clear that the remodeling done to the house in the amount of $32,044.77 contributed the bulk, if not all, of the increased value of the house.

App. 429, 433, 352 N.E.2d 846, 849 (1976).[3] In these cases, "the law 'will give effect to the real and dominent [sic] intention of the parties' rather than be controlled by the form and names of the instrument." *Id.* (quoting *Kerfoot v. Kessener*, 227 Ind. 58, 79, 84 N.E.2d 190, 199 (1949)). Here, John and James executed the deed with an oral agreement that the house would be reconveyed to James when James was "ready." John paid James $37,000 [4] for real estate valued at $128,000, and James assumed his father's mortgage. The intent of the parties is clear: James would continue to pay the house's expenses and live in the house, and as soon as James was "ready," his father would transfer title of the house back to James in exchange for the $37,000.[5] When asked what he expected when he consummated the expected retransfer to James, John replied that he wanted only to "get my money out of it." [6]

3. In *Moore,* the Moores owned property that was subject to a first mortgage and a lien. *Id.* at 430–31, 352 N.E.2d at 847. The Moores asked the Linvilles to lend them money to pay off the encumbrances and other bills incident to the property. *Id.* at 431, 352 N.E.2d at 847. The Linvilles executed a detailed agreement whereby they lent the Moores money in exchange for title to the Moores' house. *Id.* at 431 32, 352 N.E.2d at 847–48. Once the money was paid, title would be given back to the Moores. *Id.,* 352 N.E.2d at 848. The Moores fell behind on the payments to the Linvilles. *Id.* at 432–33, 352 N.E.2d at 848. Although the court held that the Linvilles were the fee simple owners of the property, the court ultimately based its decision on the Moores' failure to comply with the requirements of the agreement to make the payments. *Id.* at 436, 352 N.E.2d at 850. This "failure to do equity" denied the Moores equitable relief. *Id.* The court set out several factors that bear on creation of an equitable mortgage, including: (1) whether pre-transaction negotiations were aimed at protecting the property from claims of other creditors; (2) whether the grantor has become indebted as part of the transaction; (3) whether the instruments provided that the grantor could redeem the land by performing certain conditions within a certain time; (4) whether the grantee gave inadequate consideration for the transaction; (5) whether the grantor paid interest to the grantee; (6) whether the grantor retained control, possession, and use of the property where no rent was fixed or paid; (7) whether the grantor improved the real estate, which a tenant would not likely do; and (8) whether the grantee did not exercise any control or ownership of the property. *Id.* at 434–35, 352 N.E.2d at 849–50.

4. There is some discrepancy in the record as to exactly how much John paid his son for the house. John testified that James owed him $37,000. The closing statement shows the father paid $39,008.98, but that amount may include miscellaneous adjustments that are not explained in the record, such as accrued taxes.

5. The trial court found that the real estate at issue was subject to two mortgages. The first mortgage was with Crown Mortgage in the amount of $89,600. This was taken out as the first transfer to John. The second was with Household Finance Corporation in the amount of $18,000. The trial court found that the second mortgage was executed by James and his father after the dissolution of marriage was filed, and was in direct violation of the Court's order. Because these proceeds were in John's hands, this mortgage was properly disregarded in calculating the equity for division of the real estate.

6. The following exchange took place during the hearing:

Attorney: Do you believe you have an equity interest in this home?
John: Certainly.
Attorney: And what do you believe your equity interest is? How much is it?
John: We have a gift equity there when I purchased the home so it's right around thirty-seven thousand dollars....
Attorney: Do you believe that you have accumulated any equity in this home during the period of time that Rita and James were married?
John: I suppose whatever the real estate market how it climbed, I have no idea.
Attorney: But you're not claiming any other equity in the home? ...
John: You mean money-wise?
Attorney: Mm-hmm.

It seems clear to me that this reflected his understanding that the transaction was, in substance if not in form, a loan of $37,000 to James. As a result, I would include the $37,000 debt to John as a liability of the marital estate.

The trial court valued the house at $165,000, subject to a mortgage of $87,000, leaving an equity of $78,000. The trial court divided this in half and gave $39,000 to each spouse. It seems clear to me that we need to take the calculation one step further and deduct the father's interest, whether viewed as a loan secured by an equitable mortgage or as a cap on the value of his equity created by the option to repurchase. Either way, the couple's interest limits John's interest to $37,000, and the value of any equity above that amount is a marital asset, regardless of whether James' and Rita's interest is viewed as ownership or a right to repurchase. After subtracting the father's $37,000 interest from the $78,000 equity the trial court awarded, Rita and James' interest in the house is $41,000. Following the trial court's ruling, which split the couple's equity in the house equally, Rita should be compensated by $20,500.

John was not properly made a party to this dissolution proceeding for the reasons explained in Part IV of this dissent. However, the nature of John's interest is irrelevant. It seems to me that its value, however viewed, is $37,000 on this record.

### III. Case Law Supports Rita's Interest

The majority relies on *In re Dall*, 681 N.E.2d 718 (Ind.Ct.App.1997), where the court refused to include in the marital estate a couple's marital home that the wife's parents paid for and helped construct, but later refused to transfer to the couple. The *Dall* court held that "an equitable interest in real property titled in a third-party [sic], although claimed by one or both of the divorcing parties, should not be included in the marital estate." *Id.* at 722. *Dall* declined to follow a prior case, *Sovern v. Sovern*, 535 N.E.2d 563 (Ind.Ct. App.1989), that included real estate titled to the parents of a married couple in the marital pot when the couple divorced. *Dall*, 681 N.E.2d at 721. *Dall* distinguished *Sovern*, stating that the mother in *Dall* refused to transfer the house to the couple, and therefore, "[the couple] did not have a definite agreement that title would be transferred to them." *Id.* *Dall* held, as a result, the husband and wife did not possess the "definite interest necessary for the home to be included in the marital estate." *Id.*

In *Dall*, the wife's father purchased a lot for the couple, paid all the contractors and subcontractors for building materials for the house, and helped construct the home. *Id.* at 719. During the construction of the home, the wife's mother refused to convey the house. *Id.* at 720. The parents made all mortgage payments after the couple moved in. *Id.*

In this case, James had a continuing interest in the property, John never paid the mortgage on the house, and John was willing at all times to transfer the property to James and Rita. John did not construct the house at issue. Rather, James purchased the house from a third party during his first marriage, and held the property jointly with his first wife. Unlike the Dall parents, John "bought" the house from James for less than full consideration with the understanding that John would "sell" the house back to James once James was able to get "on his feet." James, and later

John: No, all I want is whatever I put into it and if the home had sold to someone else or to him whatever the selling price is, if I get my money out of it, whatever is left over if there's anything, why—.

James and Rita, continued to live in the house and carry its expenses, including mortgage payments. Finally, unlike *Dall,* where the mother refused to convey the house, in the present case, John was willing to deed the house to the couple whenever James was "ready."

All of these facts distinguish this case from *Dall,* and more closely resemble *Sovern.* The court in *Sovern* acknowledged the trial court's "astute recognition" that "[b]are legal title alone does not eliminate either the property or the investment thereon from being a part of the marital estate to be considered by the Court in arriving at an equitable division." 535 N.E.2d at 565 n. 1. The son in *Sovern* was awarded a marital residence and an auto body shop. *Id.* at 567. The residence was titled in the name of his parents, and the son, as well as both sets of parents, helped with construction of the house. *Id.* at 564–65. Although both sets of parents contributed money and various items, most of the money to construct the home came from the son and daughter's marital resources. *Id.* at 565. The parents were willing at all times to deed the property to the couple. *Id.* The son held himself and his wife out as owners, and the house was insured in both the son and daughter's names, not

the parents'. *Id.* Here, like *Sovern,* the property at issue is titled in the father's name, but the father as well as Rita and James all have contributed equity to the house.

The majority points out that there is no specified date for John to transfer back to James, and neither the price nor the terms of the transfer was fixed by any documents. It seems to me that the time term was set by a condition, albeit a nebulous one, that James get back "on his feet" and the price was to "get [John's] money out of it." [7] Here, the parties' testimony gives an even more solid footing to fill these lacunae.

## IV. Personal Jurisdiction and Joinder of the Father

I believe the trial court and Court of Appeals were incorrect in holding that John was properly served and made a party to the dissolution proceedings. However, I believe that issue is irrelevant to this case. Although the dissolution court could not determine John's rights in the house without joining John, it could determine, as between James and Rita, what assets are in the marital pot.

In July 1997, Rita filed a "Motion to Join" John as a party pursuant to Trial

---

**7.** A contract for the sale of land is subject to the Statute of Frauds. Ind.Code § 32-2-1-1 (1998). However, this transfer does not fall within the purview of the Statute of Frauds for several reasons. First, in my view, this transaction is not incident to an agreement for the sale of land, but rather an agreement to lend money secured by title to James' house. Second, even if this transaction is viewed as a sale of land, this would fall within an exception to the Statute of Frauds because part performance of the agreement was exhibited when Rita and James continued possession of the house and made several improvements to the land. *Cf. Dupont Feedmill Corp. v. Standard Supply Corp.,* 182 Ind.App. 459, 463, 395 N.E.2d 808, 811 (1979) ("Circumstances generally held sufficient to invoke the

doctrine of part performance as an exception to the Statute of Frauds are some combination of the following: payment of the purchase price or a part thereof, possession, and lasting and valuable improvements on the land."). Finally, John would be estopped from denying a contract existed based on the theory of promissory estoppel because all parties involved admitted an oral agreement existed. *Cf. Wabash Grain, Inc. v. Bank One,* 713 N.E.2d 323, 326 (Ind.Ct.App.1999) (where estoppel has been established by showing that other party's refusal to carry out terms of agreement resulted in unjust and unconscionable injury and loss, a case may be removed from the operation of the statute of frauds).

Rule 20(A)(2).[8] She mailed a copy of this motion to James' counsel by first class mail, but she did not serve John with a copy of the motion and issued no summons. The final hearing on the parties' dissolution took place in January 1998. During the first day of a two-day hearing, John was called as a witness by Rita. John made no objection to being called as a witness, and voluntarily testified.

The trial court found that John was a necessary party to the litigation pursuant to Trial Rule 20(A)(2) and, when it filed the dissolution decree in August of 1998, ruled for the first time that he was joined as a party. John unsuccessfully filed a "Motion to Correct Errors" claiming the trial court erred by joining him as a party. *Vadas v. Vadas*, 728 N.E.2d 250, 255 (Ind. Ct.App.2000). The Court of Appeals concluded that John voluntarily waived any objection to personal jurisdiction because he voluntarily appeared in court and participated in the proceedings by testifying as a witness without objection. *Id.* at 256. As a result, the Court of Appeals held that John was precluded from challenging the trial court's personal jurisdiction over him. *Id.*

In my view, John was never added as a party by the trial court. Indiana Trial Rule 4 provides that "[t]he court acquires jurisdiction over a party or person who under these rules commences or joins in the action, is served with summons or enters an appearance, or who is subjected to the power of the court under any other law." Ind. Trial Rule 4. John meets none of these tests. He did not commence or join the action, he was never served with a summons, and he did not enter an appear-

ance. There is no statute authorizing this procedure to add a party.

The parties cite no Indiana precedent for the proposition that testifying as a witness without objection at a trial subjects a witness or his property to the jurisdiction of the trial court, and I know of none. Indeed, in my view, this procedure violated John's due process and due course of law rights guaranteed by the federal and state constitutions. The minimal requirements of due process are notice reasonably calculated to apprise an interested party of the pendency of the action, *Matter of Murray*, 266 Ind. 221, 223, 362 N.E.2d 128, 129 (1977), the opportunity to present evidence on one's behalf, *Anderson Fed. Sav. & Loan Ass'n v. Guardianship of Davidson*, 173 Ind.App. 549, 555, 364 N.E.2d 781, 784 (1977), the opportunity to cross-examine witnesses, *Armes v. Pierce Governor Co., Inc.*, 121 Ind.App. 566, 575, 101 N.E.2d 199, 203–04 (1951), and the opportunity to be fully heard, *Neill v. Ridner*, 153 Ind.App. 149, 155, 286 N.E.2d 427, 430 (1972). These rights apply to third parties who are needed to adjudicate an issue, just as they do to any other party to a proceeding. *Anderson*, 173 Ind.App. at 556, 364 N.E.2d at 785. Because John was never given the benefit of any of the procedures required by Trial Rule 4, he was not put on notice that his rights were being adjudicated. Formal summons and service can be waived, but waiver requires a set of circumstances where the person charged with waiver is aware he has been served and takes actions inconsistent with asserting failure of service. When John appeared at his son's trial and testified at his son's

---

8. Indiana Trial Rule 20(A)(2) provides:
   All persons may be joined in one [1] action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of, or arising out of, the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

divorce hearing, he could expect his son's rights to be adjudicated, but he had no reason to believe his own interests were to be resolved.

Serving a copy of the motion on the lawyer representing John's son did not cure this problem. James' lawyer already represented James in the dissolution and could properly assume she received her copy of the motion on behalf of her client pursuant to Rita's obligation to serve her with a copy of any motion. The lawyer had no indication that the motion served on her was intended to put a third party on notice, even if the third party was her client's father. There is no reason to question James' lawyer's statement that she accepted the service as the attorney for James, not as the attorney for John.

In my view, Rita unnecessarily sought to add John under Indiana Trial Rule 20(A)(2). Had Rita sought title to the house, Trial Rule 20(A)(2) would have been necessary because an order terminating John's interest would be required. However, Rita asked only for a dollar amount reflecting her interest in the marital assets. That can be awarded without affecting John's title to the house. Because John was not made a party, John is still free to dispute the extent of his interest in the house. If John chooses to do that, James will be exposed to the risk of inconsistent adjudications. To avoid this risk, however, James could, if he wished, have invoked Indiana Trial Rule 19(A)(2)(b). That rule provides:

A person who is subject to service of process shall be joined as a party in the action if . . . he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may . . . leave any of the persons already parties subject to a substantial risk of incurring double, multi-

ple, or otherwise inconsistent obligations by reason of his claimed interest.

T.R. 19(A)(2)(b). This rule provides for mandatory joinder to avoid James' exposure to paying both Rita and John for the same asset. If this procedure had been invoked, John's rights would have been properly adjudicated in this proceeding.

In sum, I think it was error to treat John as a party. The only effect of this proceeding is to determine that James, not James and Rita, owns whatever interest the couple, or either of them, had in the property. Only James and Rita are necessary parties to this adjudication, and only they are bound by it.

### Conclusion

In conclusion, I would include the real estate at issue in the marital estate, and compensate Rita in the amount of $20,500, $18,500 less than the trial court and Court of Appeals would award her, but $20,500 more than the majority awards. Further, I would hold that the trial court erred by finding John to be properly added as a party to this action, but find this error irrelevant to the resolution of the dissolution.

SULLIVAN, J., concurs.