ONE DUPONT CENTRE, LLC and Ronald Cohen, Appellants–Plaintiffs,

v.

DUPONT AUBURN, LLC, Appellee–Defendant.

No. 02A05–0312–CV–624.

Court of Appeals of Indiana.

Dec. 21, 2004.

Stephen R. Snyder, Randall L. Morgan, Snyder, Birch, Cornwell & Morgan, LLP, Syracuse, IN, Attorneys for Appellants.

Larry L. Barnard, Carson Boxberger LLP, Fort Wayne, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Dr. Ronald Cohen appeals the trial court's denial of his complaint for a permanent injunction arising from a dispute with a neighboring landowner. Cohen purchased land adjacent to a pond to construct a professional building overlooking that pond. The seller explained that the adjacent land would be a common area perpetually. Several years later, the adjacent land was sold, and while the pond was retained, an office building was constructed on the land. Because we find no irrevocable license and that no restrictive covenants barred the development of the land, we affirm.

### Facts and Procedural History

Cohen and One Dupont, LLC, ("Cohen") own real estate on the outside ring of a circular drive at a Fort Wayne medical park ("Park") upon which they constructed a building that houses, among other

things, Cohen's orthodontics practice. Cohen obtained the land in July 1995 from the St. Joseph Medical Center of Fort Wayne, Inc. ("Hospital") in exchange for an off-site parcel of land that Cohen had previously purchased for the purpose of constructing a building for his orthodontics practice. Before obtaining the land, Cohen negotiated primarily with Bernard Niezer, the Hospital's Vice President of Planning and Business Development and its Chief Operating Officer. Niezer had the responsibility of directing the Park's development and, once development was complete, operating the Park. Cohen, his architect, and Niezer met and discussed the site plan for the Park—including the location of the available lots and the common areas.

A primary consideration in Cohen's ultimate decision to obtain the land was the fact that it was contiguous to one of the Park's common areas, a parcel of land also in the outside ring containing a retention pond ("Pond Parcel"). In fact, the trial court specifically found that Cohen would not have purchased his land if commercial development of the Pond Parcel had been represented to be allowed. The pond largely influenced the building's design. The operatory area of Cohen's practice overlooks it. The walls in that area contain tall, wide windows with all six of Cohen's procedure-chairs facing the windows. Moreover, from a market value standpoint Cohen paid a higher price for his lot in part because of its proximity to the Pond Parcel. Another consideration in Cohen's choosing of his land was the visibility of the building and its sign from Dupont Road, although the building's sign ultimately was not placed where it could be seen from Dupont Road.

Before obtaining the land, Cohen had received information from at least three sources that the Pond Parcel was a common area that was not for sale and would not be developed. First, during negotiations Cohen asked Niezer about purchasing the Pond Parcel. Niezer said that the Pond Parcel was not for sale because it was a common area and would remain so perpetually. Second, the site plan showed that there was to be no development on the Pond Parcel. Third, the Park's development consultants, Sturges, Griffin, Trent & Co.[1], informed Cohen that the Pond Parcel was not for sale and it would not be developed. However, the Exchange Agreement—through which Cohen exchanged his off-site land for the real estate in the Park—did not restrict the right of the Hospital to develop the Pond Parcel.

In June 1995, the Hospital prepared and submitted a Primary Development Plan ("1995 Plan") to the Allen County Plan Commission ("Commission") for the commercial development of the Park real estate. This 1995 Plan sought approval for commercial development and designated common areas of the Park. The 1995 Plan showed that the Pond Parcel was specifically labeled "Common Area A"; however, this Plan was never recorded. On March 7, 1996, the Hospital executed and filed the Declarations of Easements and Restrictive Covenants. On March 12, 1996, the Restrictive Covenants ("1996 Covenants") were recorded in the Allen County Recorder's Office. Two days later, Cohen received a deed from the Hospital that conveyed his land; this deed was recorded March 16, 1996. Thus, Cohen took title to the land subject to the 1996 Covenants, which had been recorded.

1. The principals of Sturges, Griffin, Trent & Co. at that time were Barry Sturges, Lowell Griffin, and Gary Trent. Sturges and Griffin are the controlling members of Dupont Au-

burn, LLC, the appellee in this case, but Griffin sold his interest in Sturges, Griffin, Trent & Co. to Sturges and Trent in 1996. Sturges remains a principal.

In July 1998, the Hospital gifted the real estate on the outside ring to the St. Joseph Community Health Foundation ("Foundation"). As part of this conveyance, the Hospital and Cohen executed Amended Easements and Restrictive Covenants ("1998 Covenants"). They were intended to allow for development of the land on the inside of the circular drive; they incorporated by reference the 1995 Plan that defined the land on the outside ring. Before signing, Cohen asked Niezer if the real estate on the outside ring would be modified with the conveyance. Niezer informed Cohen that he was not aware of any changes. The 1998 Covenants were filed and recorded in the Allen County Recorder's Office.

The 1996 Covenants provided in pertinent part:

> "Common Area" shall mean and refer to the rights-of-way, roadway easements, retention pond and its allied easements **as dedicated by separate instrument currently, by amendment to this agreement, or as dedicated by separate instrument in the future,** as well as culverts, median strips, including landscaping, and identification signs located in [the] Park.

Appellants' App. p. 13 (emphasis in original). The 1998 Covenants were substantially similar to the 1996 Covenants, but the 1998 Covenants also provided: "Such dedication shall be effective upon the recording of the instruments referred to hereinabove or upon conveyance of the Association." *Id.* at 16. The 1996 Covenants also provided, in pertinent part:

> To the extent constructed and dedicated in the future or currently existing at the time of the execution of this restrictive covenant, all owners shall have the right to use the Common Area in ... [the Park].... **The Developer reserves the right to convey the Common Area to the Association for the benefit of all owners; however, the Developer, or his successor in interest, shall be required to convey the Common Area to the Association no later than the time that the improvements upon all of the Real Estate within [the Park] have been completed.**

*Id.* at 13 (emphasis added). The 1998 Covenants also provided for conveyance of the Common Areas to the Association and similarly provided that the dedication of the common area within the Park would be effective upon any common area being dedicated in a separate instrument or when that land was conveyed to the Association after the execution and recording of the 1998 Covenants. The 1998 Covenants did incorporate by reference the 1995 Plan in the 1998 Covenants' definition of "Out Parcel Real Estate" as follows:

> "Out Parcel Real Estate" shall mean those certain lots or parcels of land ... contained within the Real Estate and located around the exterior of the Ring Road **as shown on the Development Plan for the [Park], which Out Parcel Real Estate is depicted on the [1995] Site Plan for the [Park] attached hereto ... and incorporated herein by this reference.**

*Id.* at 16–17 (emphasis in original).

Significantly for this case, the 1995 Plan, which did show the Pond Parcel as a common area, was never "dedicated by a separate instrument" as a common area even though the 1995 Plan (showing the Pond Parcel as a common area) was incorporated by reference in the 1998 Covenants under its definition of "Out Parcel Real Estate." Moreover, at no time did any other separate instrument so dedicate the Pond Parcel. Additionally, the Pond Parcel was never conveyed as a common area to the Association.

In April or May of 1998, Sturges, Griffin, Trent & Co. told a third party that the Pond Parcel was not available for development. In July or August of that year, Samuel Schenkel of Sturges, Griffin, Trent & Co. assumed the responsibility of overseeing the construction of the final phase of the Park's development and assisting in the brokerage of the lots on the outer ring owned by the Foundation. In late 1998, Mike Carr called on behalf of the Foundation and asked whether the Pond Parcel could be sold; apparently, the Foundation wanted to dispose of all properties on the outer ring in order to use the proceeds for its missions. Schenkel's response was that the Pond Parcel was a good piece of land to be potentially sold.

In the fall of 1998, Cohen learned that the Pond Parcel was potentially to be developed. At a meeting in late fall/early winter of 1998, Cohen viewed a plan that said that the Pond Parcel was available for sale or development. Cohen objected to the development of the Pond Parcel via letter, a copy of which was received by Schenkel. Sturges, Griffin, Trent & Co. placed a brokerage sign on the Pond Parcel and put the Pond Parcel in its marketing materials for the Park. Subsequently, Schenkel, Cohen and the counsel for the Foundation met to discuss the Pond Parcel; at the meeting Cohen explained that the property should not be developed. Schenkel and the Foundation's counsel disagreed and explained that the Foundation had the right to develop the property.

One year after Schenkel began his attempts to sell the Pond Parcel, he received an inquiry from Lowell Griffin—a former principal of Sturges, Griffin, Trent & Co., not involved in developing the Park—about purchasing the Pond Parcel. Griffin was inquiring on behalf of the stockbrokerage firm of Raymond James & Assocs., Inc. ("Raymond James"). Griffin learned in late December 1999 or early January 2000 that Cohen was concerned about the sale of the Pond Parcel. For tax purposes Dupont Auburn—whose controlling members Sturges (a current principal of Sturges, Griffin, Trent & Co.) and Griffin-decided that it would be beneficial to do a Section 1031 exchange[2] on the Pond Parcel and a shopping center that they had just sold and then lease the property to Raymond James. In January 2000, Dupont Auburn entered into a purchase agreement with the Foundation for the Pond Parcel; the purchase price was $669,000. The purchase agreement contained contingencies for Dupont Auburn to obtain approvals from the Commission and, based on the fact that Griffin was aware of Cohen's concerns, for Cohen not taking legal action to stop the project. In February 2000, Dupont Auburn entered into an office lease with Raymond James for a building to be constructed on the Pond Parcel. The lease contained a contingency with respect to obtaining the approval of the Commission.

After the execution of the purchase agreement, Dupont Auburn sought to

---

**2.** A "Section 1031 Exchange" is also known as a "Like–Kind Exchange" that

represents a way to postpone the recognition (taxation) of gain essentially by shifting the basis of old property to new property. If, in addition to giving up like-kind property, you pay money in a like-kind exchange, you still have no recognized gain or loss. The basis of the property received is the basis of the property given up, increased by the money paid. There are several rules and restrictions that must be strictly adhered to in order for a successful exchange to take place. Deferred exchanges will be treated as a sale rather than an exchange to the extent that the taxpayer actually or constructively receives money or other (not like kind) property in exchange for the like-kind property given up.

*See* http://www.irs.gov/faqs/faq-kw2.html (last visited Dec. 3, 2004).

amend the 1995 Plan to permit construction on the Pond Parcel. However, the January 1999 amended site development plan ("1999 Plan") was prepared and showed proposed development in the center ring but not in the outer ring and Pond Parcel. In other words, as to the outer ring and Pond Parcel, the 1999 Plan was identical to the 1995 Plan. Moreover, in both the 1995 and 1999 Plans—unlike the lots that were available for development—the Pond Parcel did not contain a lot number, access points, or utilities. The Pond Parcel was labeled as a common area in both plans.

As the trial court observed, "[T]he original intent of Dupont Auburn's predecessor in interest and developer (the Hospital), was not to develop the [Pond Parcel]. Moreover, Dupont Auburn was aware of this at the time of its purchase of the Common Area Real Estate." *Id.* at 21. The Foundation, Dupont Auburn, and Sturges, Griffin, Trent & Co. were aware of Cohen's objections and proceeded with plans to develop the Pond Parcel. Schenkel, on behalf of Sturges, Griffin, Trent & Co., and Griffin, on behalf of Dupont Auburn, filed a petition to modify the 1995 Plan with the Commission.

In April 2000, at Dupont Auburn's request, a public hearing was held to amend the 1995 Plan. Cohen appeared at the hearing and remonstrated in opposition to Dupont Auburn and the Foundation's proposal that the Pond Parcel be commercially developed. Specifically, Cohen explained that when he obtained his real estate it was represented to him that the Pond Parcel was a common area. Griffin and Schenkel appeared on behalf of Dupont Auburn, and Schenkel also appeared on behalf of Sturges, Griffin, Trent & Co., who was representing the Foundation. On May 31, 2000, Dupont Auburn closed its purchase of the Pond Parcel, and the deed conveying title to Dupont Auburn was recorded on June 1, 2000. Thus, Dupont Auburn closed the purchase and recorded the deed *after* the public hearing but *before* the Commission had issued its decision. This was so because the deadline for the Section 1031 Exchange was May 31, 2000, and furthermore, Dupont Auburn was confident that its plan presented to the Commission would be approved. Dupont Auburn took title to the Pond Parcel, subject to the 1998 Covenants and the 1995 Plan.

On June 22, 2000, the Commission approved Dupont Auburn's amended plan. Cohen did not file an action for a Writ of Certiorari after the Commission's approval of Dupont Auburn's amended plan. In July 2000, Dupont Auburn contracted with Shawnee Construction for the construction of the first of three buildings on the Pond Parcel and groundbreaking was held that same month. Two days before the groundbreaking, Cohen initiated this action seeking permanent injunctive relief before Dupont Auburn constructed a building on the Pond Parcel. Before Cohen filed his complaint, some minor preliminary work had begun on the Pond Parcel. As of January 13, 2001, Dupont Auburn had spent over 1.5 million dollars on the construction of the Raymond James building and the remainder of the Pond Parcel. Dupont Auburn did so, though, with full knowledge that the courts could require it to remove the buildings on the Pond Parcel and restore the land.

It was not until June 12, 2002, that the Foundation conveyed to St. Joseph Health System, LLC ("St.Joseph") the pond that is located on the Pond Parcel. Before this date, neither the pond nor the Pond Parcel were dedicated as Common Area pursuant to a separate instrument or conveyed to the Association, as would be required under both the 1996 Covenants and 1998

Covenants. In short, the pond on the Pond Parcel did not become a Common Area until 2002.

Cohen still has a view of the pond from his operatory area. Cohen's primary complaint about the Raymond Jones building is that the patients in his operatory area's chairs can see traffic on Dupont Auburn's driveway leading into the Raymond Jones parking lot. However, before the Raymond Jones building was constructed, Cohen's patients could see traffic on the Park's circle drive. Cohen admits that there is more traffic on the circle drive than on Dupont Auburn's driveway.

Cohen filed a complaint for a permanent injunction. He produced evidence in an attempt to show the damage that the development of the Pond Parcel had on his business. Cohen's accountant testified but did not produce any evidence as to the reduction, if any, between Cohen's income before the Raymond James building was constructed and after the building was constructed because the accountant had not been asked to make such calculations. In fact, the accountant testified that it is possible that Cohen has suffered no loss of income due to the Raymond Jones building. One of the architects involved in the construction of Cohen's building testified that he could not say if the construction of the Raymond Jones building negatively impacted the "design intent" of Cohen's building. *Id.* at 27. The trial court found that the reduction in new patients for Cohen's practice, if any, could be attributed to a variety of factors, including the economy or competition from other orthodontists in the area. Cohen could not say whether he lost patients or failed to acquire patients due to the construction of the Raymond Jones building.

The court found that there was no measurable loss in value of Cohen's property caused by the Raymond Jones building and that there would be no loss of value if more buildings were added to the Pond Parcel. The court also found that Cohen's building sustained no impact as to its function by the construction on the Pond Parcel. Finally, the court declined to make a comparison between aesthetic values in residential subdivisions and commercial real estate, specifically commercial medical real estate. Cohen's complaint for a permanent injunction against Dupont Auburn was denied. This appeal followed.

## Discussion and Decision

Cohen makes three arguments on appeal. First, he argues that the Pond Parcel was a common area not subject to development on the basis of an irrevocable license. Second, he argues that the development of the Pond Parcel was prohibited by private recorded restrictive covenants. Finally, he argues that there are no adequate remedies at law for his injuries from the commercial development of the Pond Parcel. Because we do not find either an irrevocable license or restrictive covenants, we do reach the issue of damages. We address the first two arguments in turn.

Because the trial court entered findings of fact and conclusions of law in this case, our standard of review is two-tiered. *Oil Supply Co., Inc. v. Hires Parts Serv., Inc.*, 726 N.E.2d 246, 248 (Ind.2000). First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.* We will disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We consider only the evidence favorable to the trial court's judgment. *Id.* Challengers must show that the trial court's findings are clearly erroneous. *Id.*

## I. Irrevocable License

In the context of real estate, a

license[3] "merely confers a personal privilege to do some act or acts on land without conveying an estate in the land." *Contel of Ind., Inc. v. Coulson,* 659 N.E.2d 224, 228 (Ind.Ct.App.1995), *trans. denied.* A license is revocable and unassignable. *Selvia v. Reitmeyer,* 156 Ind.App. 203, 207, 295 N.E.2d 869, 872 (1973). An "irrevocable license," which Cohen claims exists here, is different than a license. This court has explained that "an irrevocable license in legal effect is no different than an easement," *Indus. Disposal Corp. of Am. v. City of E. Chicago,* 407 N.E.2d 1203, 1206 (Ind.Ct.App.1980), and that "in at least two cases our courts have used the terms 'irrevocable license' and 'easement' interchangeably." *Id.; see also Closson Lumber Co., Inc. v. Wiseman,* 507 N.E.2d 974, 976 (Ind.1987) ("In many instances the legal distinction between a license and an easement becomes blurred.").

Irrevocable licenses have been the subject of very few cases in this state. As this court has explained:

> [W]hen a privilege having the characteristics of a license (or deficient in some manner to qualify as an easement) has been executed by the licensee through the expenditure of money or labor in reliance upon the license being perpetual, or when a license has been given for a valuable consideration paid, it cannot be revoked by the licensor unless he remunerates the licensee or restores him to status quo.

*Indus. Disposal Corp. of Am.,* 407 N.E.2d at 1205 (citations omitted). Our supreme court has explained that "[e]vents occurring subsequent to the granting of a license may, in effect, change a license otherwise revocable at law into an easement enforced in equity." *Closson Lumber Co.,* 507 N.E.2d at 976. Thus, it would appear that for Cohen to prevail on the theory that he was granted an irrevocable license he must demonstrate that he was granted a privilege having the characteristics of a license and either that he expended money or labor in reliance upon the license's being perpetual or that the license was given for valuable consideration. We find that Cohen was granted no privilege, thus we do not reach the issue of money or labor in reliance or consideration.

We are unable to discern what, if any, "privilege" the Hospital, the Foundation, or Dupont Auburn bestowed upon Cohen that allowed him to do any act on the Pond Parcel. Cohen seems to suggest that the "license" consisted of Cohen's unobstructed viewing of an undeveloped Pond Parcel from his land. Cohen makes no representation that he ever did any act on the Pond Parcel. Cohen has pointed to no irrevocable license cases, and our research has uncovered none, in which the license consisted of permission to view the licensor's land from the licensee's land, much less permission to view the licensor's perpetually undeveloped land. In fact, the cases we have uncovered finding an irrevocable license entail the licensee's having physical contact with the licensor's land in some capacity. *See, e.g., Closson Lumber Co.,* 507 N.E.2d at 976 (permission to use licensor's property to access licensee's warehouse and to pour a blacktop driveway on licensor's property for that purpose);

---

**3.** Licenses and easements are often mistaken for one another. This court has explained the difference by noting that an easement "is a liberty, privilege, or advantage in land without profit existing distinct from the ownership of the land, and **generally constitutes an interest in the land itself,**" *Indus. Disposal Corp. of Am. v. City of E. Chicago,* 407 N.E.2d 1203, 1205 (Ind.Ct.App.1980) (emphasis added), whereas a license "merely confers a privilege to do some act or acts on the land without possessing any estate therein ... [and] may be revoked at will...." *Id.*

*Mund v. English,* 69 Or.App. 289, 684 P.2d 1248, 1250 (1984) (permission to use a well on licensor's property and to install a pipeline from the well to licensee's property). Thus, because we find no license in the first instance, we do not reach the question whether Cohen expended money or labor in reliance of the perpetual nature of the license or whether the license was given for valuable consideration. Similarly, because we find that there was no irrevocable license, we do not need to determine the effect, if any, of notice that Dupont Auburn may or may not have had.

 Even if an irrevocable license did exist in this case, irrevocable licenses are enforced at equity. *See Closson Lumber Co.,* 507 N.E.2d at 976. A trial court has "full discretion to fashion equitable remedies which are complete and fair to all parties involved." *Lake County Auditor v. Bank Calumet,* 785 N.E.2d 279, 281 (Ind. Ct.App.2003). Because Cohen can still view the pond from his operatory area, because the Raymond James building is complete, and because Cohen produced no evidence of any harm to his business due to the development of the Pond Parcel, we do not find that the trial court abused its equitable discretion in this case.

 Moreover, if an irrevocable license did exist in this case, it would be subject to the statute of frauds.[4] *See* Ind. Code § 32–21–1–1 to –16. As we mentioned above, the legal effect of an irrevocable license is no different than the legal effect of an easement. *See Indus. Dispos-al Corp. of Am.,* 407 N.E.2d at 1206. This court has explained that easements "are interests in land and . . . contracts to grant or reserve easements are subject to the statute [of frauds'] requirements." *Chase v. Nelson,* 507 N.E.2d 640, 643 (Ind.Ct. App.1987). The statute of frauds requires that "any contract which seeks to convey an interest in land is required to be in writing." *Brown v. Branch,* 758 N.E.2d 48, 51 (Ind.2001). Cohen makes no assertion that he had a written contract with either the Hospital, the Foundation, or Dupont Auburn as to the irrevocable license that the Pond Parcel would remain undeveloped. He points to oral representations made by Niezer and Sturges, Griffin, Trent & Co. that the Pond Parcel was a common area that would never be developed. To the extent that Cohen identifies a writing at all, he does not identify a contract; rather, he refers to the various site plans that label the Pond Parcel as a common area. In short, even were we to find that an irrevocable license was created in this case, the statute of frauds cannot, be satisfied because there was no writing.

## II. Restrictive Covenant

 Cohen next argues[5] that the development of the Pond Parcel was prohibited under 1996 and 1998 private recorded restrictive covenants; he also points to the 1995 and 1999 site plans in which the Pond Parcel is labeled "Common Area A" as further support for his argument. Cohen argues that because the

---

4. Cohen makes no argument that any exception to the Statute of Frauds—such as part performance or promissory estoppel—applies in this case. *See Vadas v. Vadas,* 762 N.E.2d 1234, 1243 n. 7 (Ind.2002) (Boehm, J., dissenting).

5. Cohen makes a brief argument, citing primarily to an encyclopedia article, that Dupont Auburn is equitably estopped from denying a dedication because the 1995 and 1999 site plans labeled the Pond Parcel as a common area and because the Hospital's representative, Niezer, and Sturges, Griffin, Trent & Co. told Cohen that the Pond Parcel was a common area and would remain so perpetually. Cohen has failed to make a cogent argument, and as such we decline to address this argument. *See* Ind. Appellate Rule 46(A)(8)(a).

1998 Covenants incorporated the 1995 Plan by reference, and because ·the 1995 Plan showed the Pond Parcel as a common area, a restrictive·covenant existed. As a general proposition, restrictive covenants are disfavored in the law, strictly construed by the courts, and all doubts should be resolved in favor of the free use of property and against restrictions. *Renfro v. McGuyer,* 799 N.E.2d 544, 547 (Ind.Ct. App.2003), *trans. denied.* Because covenants ·are a form of express contract, we apply the same rules of construction. *Id.* Restrictive covenants will be enforced so long as the restrictions are unambiguous and do not violate public policy. *Id.*

The 1996 Covenants are clear that common areas "mean and refer to the rights-of-way, roadway easements, retention pond and its allied easements **dedicated by separate instrument** currently, by amendment to this agreement, or **as dedicated by separate instrument** in the future." Appellants' App. p. 13 (emphasis added). Additionally, the 1996 Covenants provided: "**The Developer reserves the right to convey the Common Area to the Association ... however, the Developer ... shall be required to convey the Common Area to the Association** no later than·the time that the improvements upon all of the Real Estate within [the Park] have been completed." *Id.* (emphasis added). The 1998 ·Covenants are equally clear that "dedication shall be effective upon the recording of the instruments referred to hereinabove or upon conveyance to the Association." *Id.* at 16.

The trial court found that the 1995 Plan, which did show the Pond Parcel as a common area, was never "dedicated by a separate instrument" as a common area, even though the 1995 Plan was incorporated by reference in the 1998 Covenants' definition of "Out Parcel Real Estate." No other separate instrument dedicated the Pond Parcel as a common area, and the Pond Parcel was never conveyed as a common area to the Association. On appeal, Cohen makes no argument that a separate instrument did, in fact, dedicate the Pond Parcel as a common area, nor does he argue that the Pond Parcel was conveyed as a common area to the Association. Finally, Cohen points to no evidence that the 1995 Plan was ever recorded.

The restrictive covenants are unambiguous in their definition of common areas. Cohen has produced no evidence that the language of the restrictive covenants was satisfied. Accordingly, we cannot say that the trial court erred in its finding that no restrictive covenant barred the development of the Pond Parcel.

Affirmed.

RILEY, J., and CRONE, J., concur.