ATTORNEY FOR APPELLANT

George S. Padgitt
Sever-Storey, LLP
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Steven D. Murphy
Lester H. Cohen
Matthew L. Kelsey
Defur, Voran, LLP
Muncie, Indiana



FILED
Dec 04 2015, 8:43 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Sara Ellison,<br><br>*Appellant,*<br><br>v.<br><br>Town of Yorktown, Indiana,<br><br>*Appellee* | December 4, 2015<br><br>Court of Appeals Case No.<br>18A02-1504-PL-233<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Kimberly S. Dowling, Judge<br><br>Trial Court Cause No.<br>18C02-1305-PL-9 |

**Robb, Judge.**

## Case Summary and Issue

[1] The Town of Yorktown initiated condemnation proceedings against Sara Ellison seeking to appropriate two permanent easements and one temporary construction easement on her property; specifically, Yorktown planned to construct a storm sewer and a residential hiking trail on Ellison's property.

Thereafter, the parties entered into settlement negotiations. After the parties purportedly reached a settlement agreement, Ellison executed the storm sewer and temporary construction easements, but did not execute the residential trail easement. As a result of the alleged breach of the settlement agreement, Yorktown filed an amended complaint seeking to exercise its right of eminent domain on the residential trail easement and to enforce the agreement the parties negotiated through counsel. Yorktown moved for summary judgment, arguing the parties reached a settlement agreement that satisfied the Statute of Frauds and Ellison breached the agreement when she sought additional consideration before fulfilling her end of the bargain. The trial court granted the motion and entered judgment in favor of Yorktown. On appeal, Ellison raises one issue, which we restate as whether the trial court erred in granting summary judgment in favor of Yorktown. Concluding there is no genuine issue of material fact and Yorktown is entitled to judgment as a matter of law, we affirm.

# Facts and Procedural History

[2] In early 2013, Yorktown decided to explore an alternate route for its Sports Park Storm Sewer, which was not adequately draining the Yorktown Sports Park. Contemporaneously, Yorktown was in the process of building recreation trails along Yorktown roads. Due to the location of Ellison's property, Yorktown sought to appropriate two permanent easements and one temporary construction easement that would allow the town to build a storm sewer and

recreational trail on the same strip of land running along the eastern boundary line of Ellison's property. An appraiser valued the strip of land at $10,457. On February 1, Yorktown offered $10,457 in exchange for Ellison executing the easements. Ellison did not accept the offer.

[3] On May 2, Yorktown initiated condemnation proceedings against Ellison. A month later, Ellison requested the parties convene to discuss a potential settlement of the condemnation proceeding. At the meeting, the Ellison family expressed concerns about the sewer's proposed location and asked whether it could be relocated from the property's eastern boundary line to the southern boundary. Ellison did not express any concerns about the location of the recreational hiking trail. Following the meeting, Yorktown contacted the project engineers to determine whether the storm sewer could be relocated to the southern boundary line of Ellison's property. The engineers stated the storm sewer could be relocated, but at an additional cost to Yorktown.

[4] On June 17, Ellison's attorney, William Hughes, wrote to Yorktown's attorney, Steven Murphy, stating:

> This letter is a privileged and confidential settlement communication . . . .
>
> Sara Ellison would agree to grant the Town of Yorktown ("Town") an easement fifty feet in width from the centerline of County Road 600 West on and along the east boundary line of the property owned by Mrs. Ellison for the purpose of constructing a ten foot wide recreational trail and grass aprons. Sara Ellison would also agree to grant the Town an easement

thirty-five feet in width from the centerline of Division Road on and along the south boundary line of the property and twenty-five feet in width on and along the west boundary line of the property to York Prairie Creek (Hiatt Ditch) for the purpose of installing a storm water sewer, together with an additional ten foot temporary easement for construction of the storm sewer.

Appellant's Appendix at 64 ("June 17 Letter"). Ellison also sought certain written assurances: 1) the sewer would never be enlarged, 2) the sewer would be controlled by proper mechanisms to prevent discharge when the sewer was experiencing a high flow, 3) sewer construction would take place in a fixed time frame, 4) the sewer would be at a sufficient depth and Yorktown would be responsible for maintenance of the trail, and 5) sewer construction would comply with all applicable legal requirements. The letter continued,

> If these terms are acceptable, Sara Ellison will agree to donate the recreational trail easement to the Town. The Town will provide an appraisal of the value of the donated easement for Mrs. Ellison's use for income tax purposes. Sara Ellison will be compensated for the storm sewer easement in the sum of $15,000.
>
> Upon execution of documents reflecting these terms, the pending action . . . will be dismissed.
>
> Recognizing that time is critical, this should be considered our final offer.

*Id.* at 65. The letter did not address any issues Ellison may have had with the residential trail easement. Yorktown's Town Manager, Peter Olson, understood this final offer to mean,

> if [Yorktown] would locate the storm sewer along the south side of the property, which was a location preferred by Ellison, and if [Yorktown] would pay the sum of Fifteen Thousand and 00/100 Dollars ($15,000) for the storm water easement, Ellison would execute and grant to Yorktown a temporary construction easement and a permanent storm sewer easement at the new location and also would grant by donation [the] recreational trail easement over the Real Estate at the location of the original proposed easement.

*Id.* at 21 (Olson Affidavit ¶ 7). Olson instructed Yorktown's counsel "to prepare the necessary documents." *Id.*

[5] On July 8, Murphy responded to Hughes stating Yorktown was "ready to get the matter resolved" and proposed one change in the language of one of Ellison's assurances to address a more definite engineering specification. *Id.* at 66 ("July 8 Letter"). If the change was satisfactory, Murphy stated he would "finalize the documents for resolution promptly." *Id.*

[6] On July 10, Hughes responded and stated the change would be satisfactory if Yorktown could clarify a nearby basin would not be enlarged to accept storm water from areas outside the Yorktown Sports Park. Further, "[t]o move the process forward," Hughes requested the contractor answer certain questions pertaining to the construction of the sewer and requested copies of the applicable permits "before signing the easement documents." *Id.* at 67-68

("July 10 Letter"). In a letter dated July 15, Murphy provided the requested answers.

[7] On August 7, Murphy wrote,

> We have re-written the Storm Sewer Easement, the Grant of Easement for Recreational Trail and the Temporary Construction Easement Grant which, we believe, incorporate the changes which were requested in your letters of June 17 and July 10. Please review the three documents with [Ellison] and obtain signatures that the documents are appropriate. I am informed by [Yorktown] that if we have a claim in their hands by August 13, the Town Board can approve the claim on the 19th and the checks can be delivered on Tuesday, August 20th.

*Id.* at 71 ("August 7 Letter"). Murphy then informed Olson the necessary documents had been prepared, the parties were satisfied with the language in the easements, and Ellison would deliver the documents in late August. Thereafter, because "[t]he drainage issues with the Sports Park necessitated construction of the storm water easement as soon as possible[,]" Olson instructed Yorktown's contractors to prepare "to mobilize for the construction of both the storm water facilities and for the recreational trail. The same company was constructing both projects, and it would be economical and efficient to construct both projects at the same time." *Id.* at 22 (Olson Aff. ¶ 8).

[8] On August 26, Ellison executed and delivered the temporary construction and storm sewer easements but did not execute and deliver the residential trail easement. Yorktown promptly recorded the temporary construction and storm sewer easements. At some point not clear from the record, but between August

26 and September 9, the contractor arrived on site to simultaneously construct both the storm sewer and the recreational trail.

[9]     On September 9, counsel spoke by telephone, and the conversation was memorialized in a letter written by Hughes to Murphy later that day. Hughes wrote,

> The signed storm sewer easement was delivered to you [sic] office on August 26th and you informed me, and Mrs. Ellison confirms, that work has begun.
>
> The Ellisons have not had the opportunity to consult with the accountant regarding the donation of the recreational trail easement, but Mrs. Ellison assured me today that they would make the donation per the agreement we reached to resolve all issues. However, she specifically asked that the $15,000 payment for the storm sewer easement, which I understand you are holding in your file, be released. I believe she is entitled to receive that payment now.

*Id.* at 73 ("September 9 Letter").

[10]    On September 13, Murphy responded,

> Enclosed is Yorktown's check for $15,000.00 to be held by you in trust until Sara Ellison signs and delivers the trail easement to my office (or to yours), or until she has provided to you an enforceable written assurance that she will do so by the end of this month. As we have indicated previously, we and [Yorktown] are ready to assist in any reasonable manner with respect to the technical aspects of the Ellison's [sic] donation. It is our understanding that the only reason why we do not have the

trail easement is that the Ellison's [sic] are awaiting their CPA's
blessing.

It is accurate to say that the work on the sewer and the trail is
progressing. The same crew is working on the trail easement and
it will slow progress if they can only work on one aspect of the
construction while they are on site. It is our understanding that
the Ellison's [sic] do not object to the trail easement (and have
agreed to sign it), but that they cannot do so until they have
received advice from their CPA.

We tender this check in good faith that the trail easement will be
delivered before October 1, 2013. We believe that Ms. Ellison
will have had more than adequate opportunity to secure her
CPA's blessing on this transaction by then. [Yorktown] has done
everything it promised to do, and it is entirely in the Ellison's
[sic] control to finalize this agreement. With the understanding
that the sewer and trail construction will continue, we tender this
check.

*Id.* at 74 ("September 13 Letter").

On September 19, Hughes wrote to Murphy:

Mrs. Ellison has asked me to present to you her *final* offer of
donation of the recreation trail easement to the Town of
Yorktown. Given the time to reflect, she has become concerned
about the negative impact the presence of the trail will have on
the value of her property . . . .

*Id.* at 76 ("September 19 Letter") (emphasis in original). The letter then
requested seven changes to the most recent draft of the residential trail

easement.[1] If those conditions were acceptable, Hughes stated he "must be authorized to release the payment for the storm sewer easement to Mrs. Ellison before any work on the sewer line continues." *Id.* at 76.

[12] Because Yorktown felt Ellison breached the parties' purported settlement agreement, and because constructing the residential hiking trail before winter was no longer feasible, Yorktown "was required to proceed with condemnation of that easement and was required to postpone construction of the trail until the condemnation process was completed." *Id.* at 22 (Olson Aff. ¶ 12). On October 7,[2] Yorktown filed an amended complaint seeking to exercise its right of eminent domain on the residential trail easement and to enforce the agreement the parties negotiated through counsel. Specifically, Yorktown contended Ellison breached the agreement when she requested additional assurances before donating the residential trail easement.

[13] At some point not clear from the record, Yorktown completed the condemnation process and purchased the residential trail easement for $4,665. In the summer of 2014, Yorktown constructed the residential trail on Ellison's property. Despite the condemnation proceeding being complete, Yorktown

---

[1] Specifically, the letter requested, 1) Yorktown install signage stating the trail was not to be used after dark, that no motorized vehicles or skateboards were permitted, and that the area immediately outside the easement was private property and there should be no trespassing beyond that point; and 2) Yorktown "install a farm grade, wood post Red Brand wire fence along the easement boundary for the full length of the trail with an opening for Ellisons' access to their home." Appellant's App. at 75-76.

[2] Around this time, Yorktown completed construction of the storm sewer on the southern boundary line of Ellison's property.

continued to pursue its claim against Ellison for breaching the settlement agreement. On September 12, 2014, Yorktown filed a motion for summary judgment arguing Ellison breached the agreement in failing to donate the residential trail easement. In its motion, Yorktown sought damages for the cost of court-appointed appraisers, the cost to purchase the easement from Ellison through the condemnation proceeding, attorney fees, and additional engineering and construction costs due to the contractors having to remobilize their resources on the Ellison property in the summer of 2014.

[14] On February 2, 2015, the trial court held a hearing on the issue of whether the parties reached a settlement agreement and whether Ellison breached the agreement. On March 17, the trial court granted Yorktown's motion for summary judgment and entered judgment in favor of Yorktown. The trial court reasoned the parties reached a valid settlement agreement, Ellison breached the agreement, counsel's communications satisfied the Statute of Frauds, and even if the Statute of Frauds was not satisfied, the equitable doctrines of promissory estoppel and part performance supported judgment in favor of Yorktown. This appeal ensued.

# Discussion and Decision

## I. Standard of Review

[15] We apply the same standard of review as the trial court in determining the propriety of summary judgment; it is appropriate only where the designated evidence shows there is no genuine issue of material fact and the moving party

is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Alexander v. Dowell*, 669 N.E.2d 436, 439 (Ind. Ct. App. 1996). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Spring Hill Developers, Inc. v. Arthur*, 879 N.E.2d 1095, 1099 (Ind. Ct. App. 2008). "A trial court's grant of summary judgment arrives on appeal cloaked with a presumption of validity, and the appellant bears the burden of demonstrating that the grant of summary judgment was erroneous." *Amaya v. Brater*, 981 N.E.2d 1235, 1239 (Ind. Ct. App. 2013), *trans. denied*.

## II. Contract Formation

[16] At the outset, we note all relevant communications between the parties occurred subsequent to Yorktown initiating condemnation proceedings on May 2, 2013, and we thereby interpret their communications as attempts to settle the eminent domain action. In Indiana, settlement agreements are strongly favored.[3] *Germania v. Thermasol, Ltd.*, 569 N.E.2d 730, 732 (Ind. Ct. App. 1991). If a party agrees to settle a pending action, but then refuses to consummate the settlement agreement, the opposing party may obtain a judgment enforcing the agreement. *MH Equity Managing Member, LLC v. Sands*, 938 N.E.2d 750, 757 (Ind. Ct. App. 2010), *trans. denied*. Settlement agreements are governed by the general principles of contract law and they are generally not required to be in writing. *Id.* Whether a contract exists is a question of law. *Id.*

---

[3] Because neither Yorktown nor Ellison contests whether their respective counsel had the authority to settle the claim on each party's behalf, we address each communication as written by either Ellison or Yorktown.

A valid contract consists of an offer, acceptance, consideration, and mutual assent. *See id.* In determining whether a contract is enforceable, we must consider whether there is an intent to be bound and a definiteness of terms. *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind. 1996). A breach of contract occurs when a party fails to perform all obligations that it agreed to undertake. *Ind. Gas & Water Co. v. Williams*, 132 Ind. App. 8, 15, 175 N.E.2d 31, 34 (1961).

## A. Offer, Acceptance, and Consideration

A contract is based upon an offer, acceptance and consideration. An offer must be extended and the offeree must accept it, the communication of acceptance being crucial. It is well settled that in order for an offer and an acceptance to constitute a contract, the acceptance must meet and correspond with the offer in every respect. This rule is called the "mirror image rule." An acceptance which varies the terms of the offer is considered a rejection and operates as a counteroffer, which may be then accepted by the original offeror.

*I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1034-35 (Ind. Ct. App. 1998) (internal citations omitted), *trans. denied*.

Ellison made a clear and unambiguous final offer to Yorktown in the June 17 Letter. The offer provided in consideration for Yorktown agreeing to pay $15,000 for the storm sewer easement, Yorktown agreeing to relocate the storm sewer from the eastern boundary line to the southern boundary line, and Yorktown providing certain assurances relating to the storm sewer's construction and engineering, Ellison promised to execute the storm sewer easement, the temporary construction easement, and the residential trail

easement. In other words, Ellison's final offer listed the essential terms, and if Yorktown accepted, she promised to deliver all three easements. The letter did not express any concern with the language in, the location of, or any contingencies in regards to, the residential trail easement. The June 17 Letter also provided that timing was critical and if Yorktown agreed to Ellison's terms, Ellison understood the agreement would settle the condemnation action. *See* Appellant's App. at 65 ("[T]he pending action . . . will be dismissed.")

[19] Relevant here, Ellison sought an assurance:

> The storm sewer will be of adequate capacity to drain a defined area consisting exclusively of the Yorktown Sports Park, the drainage area will not be enlarged in the future and no additional connections to the storm sewer will be permitted, including none by the Ellisons. We understand that the Town is contemplating an 18 inch storm sewer line.

*Id.* at 64. In the July 8 Letter, Yorktown responded to Ellison's final settlement offer stating it was "ready to get th[e] matter resolved[,]" but requested a change in the wording in the assurance noted above:

> Referring back to your letter of June 17, we would like to reword paragraph 1 of your assurances as follows: The storm sewer will be of adequate capacity to drain the Yorktown Sports Park, and the Town will install an 18 inch storm sewer pipe. No additional connections will be permitted to attach to the storm sewer pipe other than the Sports Park Detention basins.

*Id.* at 66 (internal quotation marks omitted). If Ellison found this change acceptable, Yorktown would "finalize the documents for resolution promptly."

*Id.* Despite Yorktown expressing no disagreement as to any other material term in Ellison's final settlement offer, we conclude the July 8 letter amounted to a counteroffer because Ellison's final settlement offer contemplated no additional connections to the storm sewer whereas Yorktown's response contemplated no additional connections "other than the Sports Park Detention basins." *Id.*

[20] In the July 10 Letter, Ellison stated, "The wording you suggest will be satisfactory *if* you can clarify that the Sports Park Detention Basins will not be enlarged to accept storm water from areas outside of the Yorktown Sports Park." *Id.* at 67 (emphasis added). The July 10 Letter did not amount to an acceptance of Yorktown's counteroffer. Rather, we interpret Ellison's July 10 Letter as another counteroffer: if Yorktown could assure the Sports Park Detention basins would not be enlarged to accept storm water from areas outside of the Yorktown Sports Park, the parties would then fully agree as to the essential terms of the settlement agreement.[4] To be clear, Yorktown never expressed any disagreement with the vast majority of the material terms of Ellison's final settlement offer, including the payment of $15,000, relocating the storm sewer to Ellison's southern boundary line, and providing the requested assurances; the only dispute barring the parties from agreeing to all of the

---

[4] In addition, we note Ellison's July 10 Letter requested answers to certain questions regarding applicable permits. Ellison does not argue, and we find nothing in the record to indicate, the questions were a material part of the parties' settlement negotiations. In any event, Yorktown provided the requested answers in its July 15 letter.

material terms was whether Yorktown could assure Ellison the Sports Park Detention basins would not be enlarged to accept storm water from areas outside of the Yorktown Sports Park.

[21] In response to the July 10 Letter, Yorktown wrote in its August 7 letter it had "re-written the Storm Sewer Easement, the Grant of Easement for Recreation Trail and the Temporary Construction Easement Grant, which, we believe, *incorporate the changes which were requested in your letters of June 17 and July 10*." *Id.* at 71 (emphasis added). By re-writing the easements to alleviate Ellison's final concern as to the potential enlargement of the Sports Park Detention basins, Yorktown accepted the terms of Ellison's counteroffer. At this point, we hold Ellison made a final settlement offer, and Yorktown accepted the offer.

[22] As to whether the agreement was supported by valid consideration, we note consideration is found when there is either a benefit to the party making the promise, or a loss or detriment to the party to whom the promise is made. *OVRS Acquisition Corp. v. Cmty. Health Servs., Inc.*, 657 N.E.2d 117, 126 (Ind. Ct. App. 1995), *trans. denied*. Here, the agreement was supported by valid consideration because in exchange for Ellison's promise to execute all three easements, Yorktown promised 1) to pay her $15,000, 2) to relocate the storm sewer to the southern boundary line of Ellison's property, and 3) to provide certain assurances in regards to the construction and engineering of the storm sewer. Therefore, we conclude the parties' settlement agreement was supported by valid consideration.

# B. Mutual Assent

[23] A meeting of the minds of the contracting parties is essential to the formation of a contract. *Wallem v. CLS Indus., Inc.*, 725 N.E.2d 880, 883 (Ind. Ct. App. 2000). Our inquiry does not focus on each party's subjective intent, but focuses on each party's outward manifestation of intent. *Centennial Mortg., Inc. v. Blumenfeld*, 745 N.E.2d 268, 277 (Ind. Ct. App. 2001). A party's assent to the terms of a contract may be expressed by acts which manifest acceptance. *DiMizio v. Romo*, 756 N.E.2d 1018, 1022 (Ind. Ct. App. 2001), *trans. denied*.

[24] Here, and as noted above, Ellison proposed a final settlement agreement which, if accepted, required Yorktown to pay her $15,000, to relocate the storm sewer to the southern boundary line, and to make certain assurances in regards to the storm sewer's construction and engineering. If Yorktown agreed, Ellison promised to execute all three easements. Yorktown agreed to Ellison's terms, and Ellison had a contractual duty to execute and deliver all three easements as agreed by the parties.

[25] On August 26, Ellison signed and delivered the storm sewer easement and the temporary construction easement, but did not donate and deliver the residential trail easement per the parties' settlement agreement. However, she did not fail to sign the residential trail easement because she disagreed with its language or because it was not a part of parties' final settlement agreement. Rather, as stated in the September 9 Letter, "The Ellisons have not had the opportunity to consult with the accountant regarding the donation of the recreational trail

easement, but Mrs. Ellison assured me today they would *make the donation per the agreement we reached to resolve all issues*." Appellant's App. at 73 (emphasis added). This evidences Ellison's initial, and continuing, manifestation of intent to be bound by the terms of the parties' settlement agreement. Ellison's manifestation of intent is further evidenced by her request for the $15,000 payment, which Yorktown tendered in good faith presuming Ellison would uphold her end of the bargain by donating the residential trail easement. Ultimately, however, Ellison declined to donate the residential easement unless Yorktown provided additional assurances in regards to the residential trail easement—assurances that were never a part of the bargained-for-exchange. Therefore, we conclude the parties formed a valid settlement agreement and Ellison breached the agreement by failing to donate the residential trail easement.

## III. Statute of Frauds

[26]     Nonetheless, Ellison contends the letters described above do not state with reasonable certainty the terms and conditions of the agreement, making the agreement unenforceable for failure to satisfy the Statute of Frauds. An easement is an interest in land within the meaning of the Statute of Frauds, and a contract creating such an interest must be in writing. *One Dupont Ctr., LLC v. Dupont Auburn, LLC*, 819 N.E.2d 507, 515 (Ind. Ct. App. 2004). The Statute of Frauds provides, in pertinent part,

> A person may not bring any of the following actions unless the promise, contract, or agreement on which the action is based, or

a memorandum or note describing the promise, contract, or agreement on which the action is based, is in writing and signed by the party against whom the action is brought or by the party's authorized agent:

* * *

(4) An action involving any contract for the sale of land.[5]

Ind. Code § 32-21-1-1(b)(4). In addition, we have held the agreement or other writing must 1) describe with reasonable certainty each party and the land, and 2) state with reasonable certainty the terms and conditions of the promises and by whom and to whom the promises were made. *Hrezo v. City of Lawrenceburg*, 934 N.E.2d 1221, 1227 (Ind. Ct. App. 2010), *trans. denied*.

[27] Although the requirements above must still be met, "[t]he 'writing' need not be the contract itself; for example, the terms of a contract can be extracted from written communications between two parties." *Stender v. BAC Home Loans Servicing LP*, No. 2:12-CV-41, 2013 WL 832416, at *3 (N.D. Ind. Mar. 6, 2013) (citing *Highland Inv. Co. v. Kirk Co.*, 96 Ind. App. 5, 184 N.E. 308 (1933)); *see also* Ind. Code § 32-21-1-1(b) (providing an agreement is valid if there is a

---

[5] In its brief, Yorktown argues an agreement to settle an eminent domain action is not subject to the Statute of Frauds because it is not a contract for the sale of land, but is merely an agreement to settle ongoing litigation that requires the transfer of land. No Indiana court before us has addressed such an argument. Although we do find some logic in Yorktown's argument, we are not persuaded to create an exception to Indiana's general rule: "[A] right to the possession of real estate is an interest therein, and *any* contract which seeks to convey an interest in land is required to be in writing." *Guckenberger v. Shank*, 110 Ind. App. 442, 37 N.E.2d 708, 713 (1941) (emphasis added); *see also, e.g.*, *Hensley v. Hilton,* 191 Ind. 309, 131 N.E. 38, 40 (1921) (holding a contract to devise real estate was required to be in writing); *Fuelling v. Fuesse,* 43 Ind. App. 441, 87 N.E. 700, 701 (1909) (holding a mutual agreement concerning a boundary line between parties was required to be in writing); *McCoy v. McCoy,* 32 Ind. App. 38, 69 N.E. 193, 195 (1903) (holding a contract for the "exchange" of real estate was required to be in writing).

"memorandum or note describing the promise, contract, or agreement"). Thus, when a series of communications between the parties sufficiently provides the essential terms and conditions of the contract, the Statute of Frauds is satisfied. *See Stender*, 2013 WL 832416, at *3 (citing *Mason Produce Co. v. Harry C. Gilbert Co.*, 194 Ind. 462, 141 N.E. 613 (1923)).

[28] Here, Ellison does not dispute whether the letters were signed or whether the letters describe with sufficient certainty the parties and the land, and we find nothing in the record to indicate anything to the contrary. Rather, Ellison contends the letters do not state with reasonable certainty the terms and conditions of the agreement. Based on the discussion above, *see supra* Part II, we conclude the parties' letters state with reasonable certainty the terms and conditions of the parties' agreement to settle the eminent domain action. Therefore, the parties' agreement satisfies the writing requirement under the Statute of Frauds.

# Conclusion

[29] We hold there is no genuine issue of material fact as to whether the parties agreed to settle the eminent domain action, whether Ellison breached the terms of the settlement, and whether the parties' agreement satisfies the Statute of Frauds. Because we conclude the parties formed a valid settlement agreement that satisfies the Statute of Frauds and Ellison breached the agreement, we conclude the trial court did not err in granting summary judgment in favor of Yorktown. We affirm.

Affirmed.

Vaidik, C.J., and Pyle, J., concur.