

FILED

Apr 06 2023, 9:04 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

John H. Haskin
John Haskin & Associates
Indianapolis, Indiana

APPELLEE PRO SE

Brandon Slate
Greenwood, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Steve Ford,

*Appellant-Defendant,*

v.

Brandon Slate,

*Appellee-Plaintiff.*

April 6, 2023

Court of Appeals Case No.
22A-SC-1018

Appeal from the Lawrence Township
Small Claims Court of Marion
County

The Honorable
Kimberly J. Bacon, Judge

49K03-2110-SC-2157

**Opinion by Senior Judge Najam**
Judges Crone and Bradford concur.

**Najam, Senior Judge.**

## Statement of the Case

[1] Steve Ford ("Ford") appeals from a small claims judgment entered in favor of

Brandon Slate ("Slate") on Slate's complaint for breach of contract. Slate's

claim arose from his employment by Ford, who, along with his wife Teresa Ford ("Teresa"), does business as Dickey's Barbecue Pit. Slate sued Ford for $4,375.00, and the trial court entered a money judgment for Slate in the amount of $3,675.00. Ford contends that the trial court erred because there was no contract between him and Slate, and, further, that all sums due to Slate from their employment relationship were paid in full and he owes nothing to Slate. We affirm.

# Issues

Ford raises three issues on appeal, which we restate as follows:

> I. Whether the trial court erred as a matter of law when it entered judgment for Slate on his breach of contract claim; and
>
> II. Whether the trial court erred as a matter of fact when it entered judgment for Slate in the amount of $3,675.00.

The third issue Ford raises is whether the trial court erred when it entered judgment for Slate on his "wage claim." Appellant's Amended Br. p. 4. Because we can discern no statutory wage claim in the record, we need not address that issue.

# Facts and Procedural History

[3] Ford and Teresa are the owners of Dickey's Barbeque Pit located on Pendleton Pike in Indianapolis, although Teresa is not named as a party to this action.[1] In April 2021, the Fords hired Slate as General Manager of the business as an at-will employee. They negotiated the terms of their employment relationship, which they set forth in a document entitled "Agreement of Services" ("the Agreement").[2] Appellant's App. Vol. 2, pp. 13-14. Ford drafted the Agreement, and Slate signed it on April 13, 2021. The Agreement provides, in relevant part:

> 1) Service provider[3] agrees to work as acting General Manager for employer. Service provider agrees to work approximately 50 hours per week with approximately 80% of that time spent in the restaurant.
>
> 2) Service provider will be employed by employer starting on April 13th, 2021. Employer has agreed to pay a $52,000 yearly compensation to service provider bi-weekly starting with first payment on April 30th for the previous two-week period ending on April 25th.

---

[1] Slate did not name Teresa or Dickey's Barbeque Pit as defendants in this case. Ford did not claim during trial court proceedings that Teresa or Dickey's were parties to this dispute.

[2] The Agreement, which Ford describes as "the alleged Contract" and the "purported agreement," Appellant's Amended Br. pp. 5 n.1, 12, was attached to Slate's small claim complaint form but was omitted from the record at trial. Ford states that the Agreement was not entered in evidence as an exhibit but that "neither party disputed at trial that it had been submitted with the initial claim form." *Id.* at 5 n.1. Ford included the document in his Appellant's Appendix. Because the existence of the Agreement is undisputed, and the parties referred to the Agreement at trial, we conclude there is no sound reason why it should not be considered on appeal.

[3] The Agreement capitalizes the words "service" and "provider" in some instances, but not in others.

3) In addition, Employer agrees to pay Service Provider $13,000 yearly compensation as a form of reimbursement for family insurance. This payment will be paid monthly to Service Provider on the last week of each month.

4) In addition, Employer also agrees to pay Service provider 40% of profits from the restaurant.

  a. This payment will be paid monthly to Service Provider for the following month of profit after profit statement is submitted by Service Provider.

  b. Employer will agree to make sure prior month financial reports are completed by the 15th as long as Service Provider provides full accounting information by the 10th of the next month.

  c. Service Provider will be given full access to the monthly profit and loss report upon completion.

  d. The 40% profit sharing is based on annual calendar profitability but will be paid monthly starting with a prorate share of April 2021 based on days employed in April (17/30).

5) Any pay period not fully completed because either party decided to end employment will result in these forms of payments (bi-weekly pay & insurance reimbursement) being paid on a pro-rated daily basis.

6) Service Provider must continue employment to the 15th of each month following the month of profit to be eligible to receive profit share. If Employer terminates Service Provider at any point the profit share will still be paid out on a pro-rated basis and the terms above in section 4 (a,b,c,d), unless caused by the Service Provider's own negligence.

7) Service Provider can earn one week of paid vacation starting immediately but not to be used in the first 90 days of employment. Two additional weeks of vacation will be earned after one year of employment not to be used within 60 days of each other.

*Id.* at 13.

[4] Slate was employed for just over seven weeks, from April 13, 2021, to June 3, 2021. On that date, Ford left a subsequently-transcribed voicemail for Slate stating, in relevant part: "we think that you need to be looking for another job and plan on not having to work for the rest of the week period." Tr. Ex. Vol., p. 7. That same day, Ford and Teresa emailed the restaurant's email account, which Slate accessed and read. The email stated Slate's job was terminated as of that day. *Id.* at 8. Ford states on appeal that, "The parties dispute whether Plaintiff was terminated or resigned," but he also acknowledged leaving the voicemail for Slate "indicating that he was terminated." Appellant's Amended Br. p. 6.

[5] Slate sued Ford in small claims court, alleging that he was owed unpaid wages and other damages arising from Ford's breach of contract. The court held a bench trial, after which it entered judgment for Slate, ordering Ford to pay him $3765.00. This appeal followed.

# Discussion and Decision

## Standard of Review

[6] Ford appeals from a general judgment. "A general judgment will be affirmed if it can be sustained upon any legal theory consistent with the evidence." *Conseco Fin. Servicing Corp. v. Friendly Village of Indian Oaks,* 774 N.E.2d 87, 92 (Ind. Ct. App. 2002), *trans. denied*.

Further, the findings or judgments rendered by a small claims court are upheld unless they are clearly erroneous. *Vic's Antiques and Uniques, Inc. v. J. Elra Holdingz, LLC,* 143 N.E.3d 300, 303 (Ind Ct. App. 2020) (quotation omitted), *trans. denied*; *see also* Ind. Trial Rule 52(A) ("On appeal of claims tried by the court without a jury, . . . the court on appeal shall not set aside the findings or judgment unless clearly erroneous . . ."). A judgment will be found clearly erroneous only when on the entire record the reviewing court is left with the definite and firm conviction that a mistake has been made. *Arnold v. Dirrim,* 398 N.E.2d 442, 446 (Ind. Ct. App. 1979).

Because small claims courts are designed to dispense justice efficiently by applying substantive law in an informal setting, this deferential standard of review is particularly appropriate. *Vic's Antiques,* 143 N.E.3d at 303. We consider the evidence most favorable to the judgment and all reasonable inferences to be drawn from that evidence. *Id.* However, we still review issues of substantive law *de novo*. *Id.*

## I. The Agreement is an Enforceable Contract

Ford first contends that there was no enforceable contract of employment between him and Slate. Specifically, Ford alleges that:

> No award for damages should have been issued under a theory of breach of contract because *no contract existed as Plaintiff's employment was 'at-will' and could be terminated at any time*. The document purported to be a contract by the Plaintiff is in reality an offer letter because it contains no term of employment for a set amount of time. Because no binding contract of employment

existed, no award of damages could have been possible under a breach of contract theory.

Appellant's Amended Br. p. 9 (emphasis added). Thus, Ford contends that the trial court erred to the extent that it held that the Agreement was an enforceable contract. *Id.* at 12. On this question, Ford presents an issue of substantive law. *See Mueller v. Karns*, 873 N.E.2d 652, 657 (Ind. Ct. App. 2007) ("The existence of a contract is a question of law"). As such, we review de novo the question whether there was an enforceable contract of employment between Ford and Slate. *Vic's Antiques*, 143 N.E.3d at 303.

[10] "A valid contract consists of an offer, acceptance, consideration, and mutual assent." *Ellison v. Town of Yorktown*, 47 N.E.3d 610, 617 (Ind. Ct. App. 2015). At trial, Ford did not deny preparing the Agreement, and Slate stated he had signed it. The Agreement defines Slate's compensation. When Ford tendered the document to Slate, he offered employment. And after Slate accepted the offer and signed the document, he was employed by Dickey's Barbecue Pit according to the terms and conditions stated in the document. Indeed, Ford concedes that, "[w]hen hired, [Slate] signed a document that laid out his benefits, compensation, incentive structure, and scope of employment." Appellant's Amended Br. p. 5.

[11] Ford does not address the elements of contract formation, choosing instead to discuss the nature of at-will employment. He states correctly that where there is no definite or ascertainable term of employment, an employment relationship is at-will and may be terminated at any time with or without cause, by either

party.  *Id.* at 10.  As noted, he contends that the Agreement he tendered, and which Slate signed, was "akin to an offer letter," which merely outlined Slate's proposed compensation and did not create an enforceable contract.  *Id.* at 11.

[12]  In making this argument Ford relies upon *Community Foundation of Northwest Indiana, Inc. v. Miranda*, 120 N.E.3d 1090 (Ind. Ct. App. 2019).  In that case, the plaintiff, a terminated employee, challenged her at-will employment status, and we held that neither the offer letter nor the employee handbook in that case constituted an employment contract that would overcome the presumption of at-will employment.  *Id.* at 1100-01.  *Miranda* recited three criteria by which an employee handbook may be deemed a "unilateral contract" that binds an employer in a "handbook exception to the employment at will doctrine."  *Id.* at 1099 (citing *Orr v. Westminster Vill. North, Inc.*, 689 N.E.2d 712, 720 (Ind. 1997)).  And in that case, the handbook expressly stated that all employees were at-will and that the contents of the handbook should not be construed as a contract guaranteeing employment for any specific period.  *Id.* at 1097-98.

[13]  Ford contends that Slate "proffered no evidence that the alleged agreement met any of the three prongs of the test articulated in *Miranda*."  Appellant's Amended Br. p. 11.  But Slate had no need to address the *Miranda* test.  *Miranda* is inapposite, and Ford's reliance on *Miranda* is misplaced, because this case does not involve an employee handbook or an attempt by Slate to circumvent the employment at will doctrine.  This case is about a single, written document setting out the terms and conditions of Slate's employment.

[14] Relying again on *Miranda*, Ford equates the offer letter in *Miranda* with the Agreement in this case. Ford contends, in effect, that because Slate was an at-will employee, the Agreement was not an enforceable contract. His contention is untenable. Slate does not argue that he was hired for a defined term or that his contract with Ford was anything other than employment at will. Instead, he sued for a breach of the other terms of his contract with Ford governing pay and benefits.

[15] Ford confuses and conflates employment at will, which is about the *term* of employment, and other terms and conditions of employment about which the parties may contract. As noted above, at-will employment simply means there is no definite or ascertainable *term* of employment and that the employment may be terminated at any time with or without cause, by either party. But as our Supreme Court stated in *Orr*, "[t]he employment-at-will doctrine is a rule of contract construction, not a rule imposing substantive limitations on the parties' freedom to contract." 689 N.E.2d at 717. As a result, even in an employment at-will relationship the parties may agree to contract and be bound by *other* terms and conditions of employment for as long as the employment-at-will relationship lasts.

[16] Here, unlike in *Miranda*, the Agreement of Services document is not a mere handbook or offer letter but a document that identifies the employer and the employee, and includes a section entitled "Scope of Agreement." The execution of the Agreement fulfilled all the requirements of contract formation.

Applying our de novo standard of review, we conclude as a matter of law that the Agreement is a valid and binding contract.

[17] Ford does not argue that, even if the contract were valid and binding, he did not breach its terms. Consequently, we next turn to his challenge to the amount of the trial court's damages award.

## II. The Damages Award is Supported By the Evidence

[18] As we have noted above, we may affirm a general judgment on any legal theory supported by the evidence. *Conseco Fin. Servicing Corp.,* 774 N.E.2d at 92. When the specific issue for review relates to the award of damages, the award should not be reversed if it falls within the scope of the evidence presented to the trial court. *G & N. Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 234 (Ind. 2001).

[19] Ford argues, "[t]he evidence proffered by [Slate] at trial was insufficient to support the award of damages in the trial court's judgment." Appellant's Amended Br. p. 15. Because this is an appeal from a general judgment, it is not readily apparent exactly how the court arrived at the $3,675.00 damage award. The next question presented, then, is whether the record contains substantial evidence of probative value that would support a judgment in that amount. There are four components to Slate's claim of damages: salary, insurance reimbursement, profit sharing, and paid vacation.

## A. Salary

The parties dispute whether Ford owed Slate for unpaid salary. Slate asserted that after he was terminated on June 3, Ford "shorted" his salary by $280.00. Tr. Vol. I, p. 9. In contrast, Ford testified that he paid Slate for all wages due through June 3, and offered a final pay stub dated June 11, 2021, admitted in evidence as Exhibit A, to prove it. *Id.* at 17; Tr. Ex. Vol., p. 12. But neither at trial nor on appeal has Ford attempted to explain by reference to the pay stub how the contents of that stub show that Ford paid Slate all the salary he was owed.

When Ford and Teresa terminated Slate's employment by email on June 3, 2021, the email provided, "Brandon will be paid for the remainder of this pay period and will also receive his pay for the current months [sic] insurance." Tr. Ex. Vol., p. 10. Ford also left a voice message for Slate on the evening of June 3 in which he stated that Slate should "just plan on not having to work for the rest of this week period." *Id.* at 7. Ford further told Slate, "We need the key back and we need that deposit [for the receipts from Slate's last day of work], and we need that before your next pay period so that we can get you your full pay." *Id.* (formatting error corrected). Finally, Ford stated, "we will pay you in full for [this] two-week period, but we need this [the key and the deposit] turned in." (emphasis added). *Id.*

On appeal, Ford contends that the statements made in the email and the voicemail did not create "a binding contract" or an obligation for Ford to pay

Slate any additional compensation. Appellant's Amended Br. p. 12. In effect, Ford contends that the statements he and Teresa made that Slate would be "paid for the remainder of this pay period" and that he would be "paid in full" were gratuitous promises made for no consideration and, therefore, not enforceable. Tr. Ex. Vol., pp. 7, 10. But these statements were coupled with Ford's request that Slate return the key and make the deposit "so that we can get you your full pay." *Id.* at 7. There is no suggestion that Slate failed to return the key or make the deposit, which was adequate consideration to support the promise.

[23] There was sufficient evidence for the trial court to conclude Slate was promised and was entitled to receive an additional $280.00 in salary for the pay period. Slate's annual salary, as stated in the Agreement, was $52,000 payable bi-weekly, from which we infer that his bi-weekly gross pay was $2,000.00 (twenty-six bi-weekly pay periods, multiplied by $2,000.00, equals $52,000.00). His final pay stub shows gross pay of $1,720.00, which supports his claim that he was "shorted" $280.00. Tr. Vol. I, p. 9.

### B. Insurance Reimbursement

[24] Under Paragraph 3 of the Agreement, Ford agreed to reimburse Slate "for family insurance," with the reimbursement "paid monthly to [Slate] on the last week of each month." Appellant's App. Vol. 2, p. 13. After Ford terminated Slate's employment, Ford stopped payment on a $1,083 check Slate had written to himself for May's insurance reimbursement, which under

the Agreement would have been payable at the end of June and, according to Ford, would only have been payable had Slate still been employed. Tr. Vol. I, pp. 20-21. Both at trial and on appeal Ford contends that Slate was entitled to the reimbursement "at the end of the subsequent month only if he was still employed at that time." Appellant's Amended Br. p. 8. But, to the contrary, Paragraph 5 of the Agreement states that if either party were to terminate Slate's employment during a pay period, the insurance reimbursement will be "paid on a pro-rated daily basis." Appellant's App. Vol. 2, p. 13.

[25] Slate claims he was entitled to an insurance reimbursement for May. He was employed for the entire month of May and, as such, his right to the insurance reimbursement for May accrued for the entire month. The fact that the reimbursement for May was not *payable* until the last week in June does not mean that the reimbursement for May was not owed to Slate when Ford terminated his employment on June 3. Ford confuses accrual of the monthly insurance reimbursement with another contract provision which defers payment of the reimbursement to the last week of the next month.

[26] The record does not support Ford's bald assertion that because the May insurance reimbursement was not payable until the last week in June, and Slate was no longer employed at that time, Slate is not entitled to the insurance reimbursement for May. Ford had valid legal cause to stop payment on the check Slate wrote himself in early June for May's insurance reimbursement because the payment was not due until the last week of June. But the

Agreement does not say that payment of the insurance reimbursement is contingent upon Slate's continued employment. Slate's right to an insurance reimbursement for May accrued as of May 31, and nothing more was required of him for that reimbursement to be paid. While payment of the reimbursement was owed at the end of June, the reimbursement for May had already been earned when Slate's employment was terminated. Thus, Slate is correct when he states in his brief that, "[r]egardless of the argument" about "when [the insurance reimbursement] is supposed to be paid, I am still owed for the month of May." Appellee's Br. p. 5.

[27] And, again, Paragraph 5 expressly provides for the daily proration of the reimbursement if Slate's employment is terminated during any pay period not fully completed. Thus, Slate is also entitled to the insurance reimbursement pro-rated for his three days of employment in June.

[28] In sum, under Paragraph 3, Slate was entitled to reimbursement for family insurance earned during the month of May in the amount of $1,083.00 ($13,000 per year divided by twelve) and, under Paragraph 5, to reimbursement pro-rated for his three days of employment in June in the amount of $108.30 ($1,083.00 divided by thirty days, multiplied by three days).

### C. Profit Sharing

[29] Slate claims a right to profit sharing equal to 40 percent of profits from the restaurant as stated in Paragraph 4 of the Agreement. He testified at trial that the month he started working for Ford "was the best month that [the restaurant]

had in six years." Tr. Vol. I, p. 10. And Ford provided profit and loss reports showing the restaurant's income for the months of April and May. Tr. Ex. Vol., pp. 13-18. Ford's business records show net income in April of $4,740.45 and a net loss in May of $666.94, for combined net income of $4,073.51 for those two months.

[30] Ford contends that Slate's "alleged profit sharing was not a wage and was thus discretionary" and that "the trial court erred to the extent that it held [Slate] was owed any amount under a profit-sharing commission scheme." Appellant's Amended Br. p. 13. We cannot agree. The Agreement clearly states that the payment for profit sharing "will be paid monthly" although "profit sharing is based on annual calendar profitability." Appellant's App. Vol. 3, p. 13. In other words, profit sharing is based on annual net income as determined by the aggregation and reconciliation of monthly profits and losses.

[31] The Agreement states that Slate is entitled to a forty percent prorated share of April income based on his seventeen days of employment during that month, provided, that he was employed on the fifteenth day of the following month (May), which he was. There was no profit to be shared in May, and under the Agreement, May's loss must be set off against April's profit. *See id.* (profit sharing is based on "annual calendar profitability" but profit sharing will be paid "on a pro-rated basis" if Slate is fired). April's net profit adjusted and reconciled with May's net loss leaves $4,073.51 in net profit available for profit sharing in April, which when prorated over thirty days is $135.78 per day.

Thus, Slate is entitled to forty percent of seventeen days in April, at $135.78 per day, which equals $923.30.

### D. Paid Vacation

[32]     Slate alleges that he is owed damages for unpaid vacation pay. Ford observes that Slate did not refer to unpaid vacation days at trial. Appellant's Amended Br. p. 7. But the Agreement includes a paid vacation provision. Further, Slate's small claims complaint requested compensation for vacation days. As such, the issue was presented to the trial court to be considered in assessing Slate's damage claims.

[33]     The first sentence of Paragraph 7 of the Agreement shows that when Slate became an employee, he was "immediately" entitled to one week of paid vacation, provided only, that he could not take the vacation within the first ninety days of his employment. Appellant's App. Vol. 2, p. 13. In other words, Slate's right to one week of paid vacation accrued and vested upon his employment, subject only to the condition precedent that he could not exercise that right during his first ninety days of his employment.

[34]     Since Slate was not employed for ninety days, the condition precedent contained in the paid vacation provision could not be satisfied. The question becomes whether Slate was divested of his right to a paid vacation when Ford and Teresa terminated Slate's employment after only fifty-one days.

[35]     A vested interest is a protected right. *See Bringle v. Bringle*, 150 N.E.3d 1060, 1071 (Ind. Ct. App. 2020) ("A vested interest is one that is not contingent, that

is unconditional, and absolute"), *trans. denied*; see also *Vested Interest*, Black's Law Dictionary p. 969 (11th ed. 2019) (defining "vested interest" as "[a]n interest for which the right to its enjoyment, either present or future, is not subject to the happening of a condition precedent"). The paid vacation provision does *not* say that Slate will be entitled to one week of paid vacation *after* he has been employed for 90 days. Instead, Slate's right to one week of paid vacation accrued and vested on Slate's first day of employment, but the exercise of that right was deferred for at least ninety days.

[36] Because Slate's employment was employment at will, Ford was entitled to terminate his employment at any time with or without cause. Thus, Slate had no right to future employment for ninety days or for any other period. But when Slate's employment was terminated, he had accrued a vested contract right to one week of paid vacation, and Ford could not eliminate that right by terminating Slate's employment.

[37] A party may not rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure. *See Rogier v. Am. Testing and Eng'g Corp.*, 734 N.E.2d 606, 621 (Ind. Ct. App. 2000), *trans. denied*. Here, Ford caused the failure of the 90-day condition precedent when he terminated Slate's employment, but Slate's termination did not extinguish his vested right to a paid vacation. If Ford could, at his option, vitiate the contract provision for a paid vacation, that provision would amount to an illusory promise. *See Pardieck v. Pardieck*, 676 N.E.2d 359, 364 n.3 (Ind. Ct. App. 1997) ("An illusory promise is a promise which by its terms makes

performance entirely optional with the promisor"), *trans. denied*. Slate is entitled to a damage award of $1,000.00 for one week of paid vacation, representing the value of one week of a two-week pay period.

## Conclusion

[38] We have calculated total damages for unpaid wages, unpaid insurance reimbursement, unpaid profit sharing, and unpaid vacation compensation of $3,394.60, which are only $280.06 or 7.6 percent less than the damages awarded by the trial court, an insignificant difference. We will not reverse a trial court's award of damages and substitute our judgment for that of the trial court where, as here, the damage award falls within the scope of the evidence. *See G & N Aircraft*, 743 N.E.2d at 234. In this case we can say with confidence that the trial court's judgment is not clearly erroneous. Accordingly, we affirm the trial court's judgment.

[39] Affirmed.

Crone, J., and Bradford, J., concur.